(No. 18787.-■

H. E. Byram *et al.* Plaintiffs in Error, *vs.* The Industrial Commission *et al.*—(Genevieve Walter, Defendant in Error.)

*Opinion filed December 20, 1928.*

C. S. Jefferson, and M. L. Bluhm, (O. W. Dynes, of counsel,) for plaintiffs in error.

Augustine J. Bowe, and William J. Bowe, for defendant in error.

Mr. Chief Justice DeYoung delivered the opinion of the court:

Genevieve Walter, the widow of John Walter, deceased, filed with the Industrial Commission a claim for compensation, alleging that on July 6, 1926, Walter suffered accidental injuries while employed by the Chicago, Milwaukee and St. Paul Railway Company and that the injuries resulted in death. The arbitrator found the jurisdictional facts to exist and awarded the petitioner, as the widow of the decedent and his sole beneficiary, $14 per week for

267-6/7 weeks. The Industrial Commission, on review, heard additional evidence and approved the arbitrator's award. The superior court of Cook county confirmed the decision of the commission, and by writ of error the record is here for a further review.

John Walter, a resident of the city of Chicago, forty-nine years of age, was employed by the Chicago, Milwaukee and St. Paul Railway Company as a freight claim investigator on the sixth floor of the railway company's building, situated at the northeast corner of Fullerton and Southport avenues, in Chicago. On the morning of July 6, 1926, Walter left his home shortly after seven o'clock. He began his work regularly at 8:10 A. M. About half-past seven o'clock George L. Burger, who was waiting to board a street car at the same corner, heard screams, and looking toward the Southport avenue side of the building saw the body of a man strike the fire-escape and roll to the sidewalk in the street. Burger ran to the place where the body lay, then crossed the street to a restaurant and notified the police of the occurrence. About the same time a street car approached and a police officer alighted from it. Walter's body was taken to a hospital. Burger proceeded to his place of employment but later in the same day was requested to appear at the coroner's inquest. He came as directed and identified the body as that of the man he saw fall from the railway company's building.

The room in which Walter worked was approximately seventy-five feet wide and two hundred feet long. It contained rows of desks and chairs for the use of the employees, and Walter's desk was near the center. There were about twenty windows on the west or Southport avenue side of the room. Shortly after Walter's body was removed from the sidewalk the window opposite his desk and directly above the point where the body struck the fire-escape was found to be open. All the other windows in the room on the sixth floor were closed. The open window was of the

ordinary type. The lower sash was raised by means of handles at the bottom, while the upper sash was lowered by inserting a pole with a hook in the top of the frame. The window was thirty-nine inches wide, and when the lower sash was completely raised, as it was on the morning of the sixth of July, the open space was thirty-five by thirty-nine inches. The window sill was forty inches and the handles on the lower sash, when raised, were seventy-nine inches above the floor. The space between the inner edge of the window sill and the outer edge of the stone base of the window was twenty-seven inches. There was a shade on the inside and an awning over the outside of the window. The awning was operated from the office by means of a cord. The windows were equipped with ventilators. They consisted of boards nine and one-half inches by forty-two inches inserted between cleats on the inside of the windows. These boards were usually left in place but could easily be removed. On the morning of Walter's death all the ventilators, except the one at the open window, were in place. This particular ventilator had been removed and stood against the wall. The open window and the awning over it were tested immediately after Walter's death and both were found to be in good order. Walter had no duty to perform with respect to the windows, except that he, like other employees, might raise or lower a window to promote ventilation. He had no occasion, in the course of his employment, to climb upon a window sill. If repairs about the building became necessary it was the duty of a carpenter employed by the railway company for that purpose to make them.

The evidence with respect to Walter's disposition for a considerable period prior to his death is in conflict. His two sons, his daughter and two neighbors testified that he was cheerful, happy in his domestic relations and without worries. On Saturday, July 3, he took his wife, daughter and one of his sons in an automobile to the Kankakee river,

near Momence, in Kankakee county. They lived at a hotel and returned on Monday. The son and daughter testified that the father was in good spirits and seemed to enjoy the trip. Eight fellow-employees, who had been acquainted with Walter from six to twenty years, testified that during the last six months of his life he complained of financial difficulties, of the lack of harmony at home, and of other troubles; that he was very nervous and paced the floor, and that he was despondent.

Walter's poor financial condition caused him much concern. Owing to the unsatisfactory character of his work, which he attributed to his despondency, his salary had been reduced in February, 1926, from $190 to $175 per month. He was constantly indebted to various persons. To several fellow-employees he owed small sums of money. A freight claim adjuster employed by another railroad company, an acquaintance of twelve years, was surety upon his note for $300. The note remained unpaid at Walter's death. He was a borrower from a certain money lender since 1922. The employees of the railway company conducted a mutual benefit and loan association, which had its office in the company's building. Within the period of two and one-half years Walter had borrowed money from this association upon his notes more than four hundred times. During the year preceding his death the association made one hundred thirty-one loans to him, aggregating $1625.50. Under the rules of the association no employee was permitted to borrow in excess of his salary and on the day it was paid he was required to make settlement of all past loans. Walter continually anticipated the payment of his salary, and he regularly endorsed to the association, in payment of his notes, the checks he received from his employer. On July 2, four days before his death, he transferred his salary check to the association but borrowed $20 from it at the time. On the next day he obtained an additional loan of $10. The company's employees also conducted an insurance as-

sociation for their benefit. Walter joined this association about a week before he died. His policy provided that in the event of his death his beneficiary would receive $1000. To various persons Walter spoke about his financial difficulties and other worries. He charged his failure to obtain another position at a higher salary to the duplicity of a friend. A fellow-employee, he said, sought his position and he feared that he would be dismissed. He complained that two of his wife's relatives lived in his home without compensating him for their board, and that his sons had caused him trouble and obliged him to pay attorneys' fees in two lawsuits. On Thursday prior to his death he said that "when he got ready to go he was going to open somebody's eyes, and when he did go he was going to take a couple of fellows with him." In February, speaking to the secretary of the loan association about his domestic troubles, he said that he could not bear them if they continued much longer, and that "the lake is near by or I can jump out of the window."

Plaintiffs in error make several contentions for the reversal of the judgment and the setting aside of the award. The only contention that need be considered is that Walter's death did not arise out of and in the course of his employment.

The decedent was a claim investigator. He had no duty to perform in connection with the windows in the office of the freight claim department. If repairs or adjustments to the windows or any of their appliances became necessary it was the duty of a carpenter employed for that purpose to make them. It does not appear that Walter's death resulted from an attempt to raise or lower the window opposite his desk or to adjust the awning which covered it. Both the window and the awning were in good working order at the time. A person standing on the floor could easily raise or lower the window with the ventilator in place, and even the awning was operated from the inside of the building. The

window sill was forty inches above the floor, and the sill, including the stone base, was twenty-seven inches in width. The record shows that the greater portion and weight of a man's body five feet ten inches tall, which was Walter's height, would be below the level of the window sill. If in attempting to open the window a man of the decedent's stature lost his balance and fell toward and into the open window, the height and width of the sill would prevent his falling to the street below. To plunge through the window he would be required to make considerable effort to that end.

Other facts and circumstances tend to show that Walter's death did not arise out of and in the course of his employment. His death occurred about forty minutes before the time fixed to begin his work for the day, and he was the only employee, out of a considerable number, present in the office at that early hour. The ventilator of the particular window had not been knocked out of its place by some object striking it but had been removed and set against the wall near the window. All the other ventilators were in place. His financial difficulties and other worries caused his despondency, and his statement to the secretary of the loan association indicated that he contemplated self-destruction unless his troubles abated. That he finally sought this method of relief is certainly as consistent with the evidence as that his death was accidental. No circumstance connected with Walter's death leads to a logical inference that at the time he was engaged in the performance of a duty which was even incidental to his employment.

Liability under the Workmen's Compensation act cannot rest upon imagination, speculation or conjecture or upon a choice between two views equally compatible with the evidence but must be based upon facts established by a preponderance of the evidence. (*Wisconsin Steel Co.* v. *Industrial Com.* 288 Ill. 206; *Chicago Daily News Co.* v. *Industrial Com.* 306 id. 212; *United States Fuel Co.* v. *Industrial Com.* 310 id. 85; *Illinois Bell Telephone Co.* v.

*Industrial Com.* 325 id. 102.) The evidence fails to show that Walter's death resulted from accidental injuries which arose out of and in the course of his employment.

The judgment of the superior court is reversed and the award of the Industrial Commission is set aside.

*Judgment reversed and award set aside.*